Filed 7/2/26  In re Wy.J. CA2/8

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## SECOND APPELLATE DISTRICT

## DIVISION EIGHT

| | |
|---|---|
| In re WY. J. et al., Persons Coming Under the Juvenile Court Law. | B346088, B348244, B349742 |
| LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND FAMILY SERVICES, | Los Angeles County Super. Ct. No. 23CCJP01385 |
| Plaintiff and Respondent, | |
| v. | |
| D.J. et al., | |
| Defendants and Appellants. | |

APPEAL from orders of the Superior Court of Los Angeles County, Linda L. Sun, Judge.  Conditionally reversed and remanded for further proceedings.

Lelah S. Forrey-Baker, under appointment by the Court of Appeal, for Defendant and Appellant D.J.

Carolyn S. Hurley, under appointment by the Court of Appeal, for Defendant and Appellant T.B.

Dawyn R. Harrison, County Counsel, Kim Nemoy, Assistant County Counsel, Navid Nakhjavani, Deputy County Counsel, for Plaintiff and Respondent.

---

Father D.J. and mother T.B. appeal from several orders of the juvenile court. Mother challenges an order limiting her to virtual visits with the children, Wy. J., Willow,[1] and Wry. J., after she kidnapped Wy. and Willow. She also challenges the denial of her Welfare and Institutions Code section 388 petition, on the eve of permanency planning, seeking reinstatement of reunification services because she completed drug treatment programs to address the issues giving rise to the dependency proceeding. (Further undesignated statutory references are to the Welfare and Institutions Code.) Both parents assert the court erred by finding the children adoptable en route to terminating parental rights. Finally, both parents argue that, at a minimum, conditional reversal is required because the Department of Children and Family Services (DCFS) did not fulfill its inquiry duties under the Indian Child Welfare Act (25 U.S.C. § 1901 et seq.) and related California law.

We conditionally reverse because of ICWA deficiencies, but otherwise affirm.

## I.

When mother gave birth to Wry., her youngest child, in April 2023, both she and the newborn tested positive for

---

[1] Although her birth certificate identifies her by a different name, the parties refer to this child, the parents' second, as "Willow." For purposes of this opinion, we do the same.

2

amphetamines and fentanyl. At the time, Wy. was three years old and Willow was nearly 19 months old.

In light of mother's drug use, DCFS initiated dependency proceedings. In October 2023, the juvenile court sustained the operative first amended section 300 petition, finding true the allegations that the children were at risk of harm due to (1) mother's use of illicit substances while pregnant with Wry.; (2) both parents' abuse of illicit substances and father's failure to protect the children from mother's substance abuse; and (3) the parents' creation of a dangerous condition in the home by keeping marijuana within the children's access. The court removed the children from their parents, granted the parents monitored visitation, and required the parents to participate in reunification services consisting of a full drug and alcohol treatment program with after care, random and on-demand drug and alcohol testing, a 12-step program with a court card and sponsor, a parenting program, and individual counseling. Further, the court directed the parents to each undergo a psychological assessment and to take all prescribed psychotropic medications.

Throughout the first six-month review period, the parents refused to participate in reunification services, believing they had done nothing wrong, that compliance with their case plans constituted admission of guilt on their part, and that DCFS had kidnapped their children. In addition, and as will be described in greater detail below, the parents attempted to kidnap Willow and Wy. from their caregivers at the outset of a monitored visit at a DCFS facility in January 2024.

Nonetheless, the parents had frequent, consistent, and high-quality in-person visits with the children. Given the strength of their visits, and despite the parents' failure to engage

3

with reunification services and their kidnapping attempt, DCFS recommended that the juvenile court grant the parents three additional months of reunification services. At the six-month review hearing held in April 2024, the court adopted DCFS's recommendation.

In the following months, the parents remained steadfast in their refusal to participate in court-ordered services, maintaining their innocence and their belief that compliance with their case plan constituted admission of their wrongdoing. Still, they continued to have regular, consistent, and high-quality visits with the children. In June 2024, however, the parents refused to end a visit, reporting to the monitor that Wy. had told them the caregivers " 'whoop[ed]' " him. DCFS promptly investigated and determined the allegation was unfounded.

Then, on August 14, 2024, the parents successfully abducted Willow and Wy. toward the end of a monitored visit taking place at a DCFS office, leaving Wry., their youngest, behind.

Wry.'s 12-month review hearing took place six days later. There, the court terminated the parents' reunification services with respect to Wry. and suspended their visits with him until they contacted DCFS.

Two weeks after the abduction of the older children, law enforcement located Wy. and Willow in a remote area of Oregon, where they had been living out of a tent with their parents. DCFS returned Wy. and Willow to their caregivers. The parents were arrested and charged with kidnapping and child abduction in violation of Penal Code sections 207 and 278, respectively. A criminal protective order, filed on September 20, 2024, prohibited the parents from having contact with Willow and Wy.

Subsequently, on October 30, 2024, the juvenile court held another 12-month review hearing, where it terminated the parents' reunification services for Wy. and Willow.

On February 18, 2025, the parents accepted a plea deal and each pled no contest to two counts of child abduction. Then, on March 3, 2025, the criminal court sentenced the parents to four years of probation and ordered, among other things, that they each complete a three-month residential drug treatment program.

Two weeks later, on March 19, 2025, the criminal court filed a new protective order applying to all three children. The order permitted the parents to have contact with the children pursuant to subsequent visitation orders issued by the juvenile court. The next week, on March 26, 2025, the parents were released into separate 90-day residential drug treatment programs.

On April 29, 2025, father's counsel filed copies of the March 2025 protective orders with the juvenile court. The next day, the court granted the parents virtual visitation, denied their request for in-person visits, and directed DCFS to draw up a written visitation schedule no later than May 9, 2025. DCFS complied with the court's order, and virtual visits began on May 9, 2025.

Mother timely appealed from the juvenile court's April 30, 2025, visitation order.

On June 2, 2025, mother filed a section 388 petition seeking reinstatement of her reunification services. Among other supporting documents, mother submitted a declaration attesting to her completion of a parenting class, a domestic violence class, and a two-part course on substance abuse while incarcerated; her current progress in and forthcoming completion of residential

substance abuse treatment; and her commitment to her sobriety. Mother also apologized for her prior actions, including her refusal to comply with DCFS and her case plan, as well as her abduction of Willow and Wy. Further, she explained that based on her strong bond with her children, cultivated through consistent visitation, she should be afforded the opportunity to reunify with them.

The next day, the juvenile court set mother's section 388 petition for an evidentiary hearing. It also, meanwhile, denied mother's request for in-person visits at a police station, and reiterated her visits must take place virtually.

On August 13, 2025, following a multi-day evidentiary hearing, the juvenile court denied mother's section 388 petition. In so doing, it found mother demonstrated changing, rather than changed, circumstances, and that mother failed to demonstrate reinstatement of her reunification services would be in the children's best interests.

At the contemporaneous permanency planning hearing, the juvenile court found by clear and convincing evidence that the children were adoptable, and no legal impediments to adoption existed. The court, therefore, terminated mother's and father's parental rights.

The parents both appealed from the order terminating their parental rights. Mother additionally appealed from the order denying her section 388 petition. On mother's motion, we consolidated case numbers B346088, B349742, and B348244 for purposes of briefing, oral argument, and decision.

## II.

## A.

The juvenile court did not abuse its discretion by restricting mother to virtual visitation in April 2025 after her history of kidnapping and noncompliance and after termination of her reunification services.

The juvenile court "has the power and responsibility to regulate visitation between dependent children and their parents. [Citations.] To satisfy this responsibility, a court must 'define the rights of the parties to visitation.' " (*In re Donnovan J.* (1997) 58 Cal.App.4th 1474, 1476.) In so doing, the court must "balanc[e] . . . the interests of the parent in visitation with the best interests of the child" to "determine whether there should be any right to visitation and, if so, the frequency and length of visitation." (*In re Jennifer G.* (1990) 221 Cal.App.3d 752, 757.) The juvenile court may also "impose any other conditions or requirements to further define the right to visitation in light of the particular circumstances of the case before it." (*Ibid.*)

"We review an order setting visitation terms for abuse of discretion." (*In re Brittany C.* (2011) 191 Cal.App.4th 1343, 1356.) Per this standard, we will not reverse unless the trial court exceeded the bounds of reason by making an arbitrary, capricious, or patently absurd determination. (*In re Stephanie M.* (1994) 7 Cal.4th 295, 318–319.) And " ' "[w]hen two or more inferences can reasonably be deduced from the facts, the reviewing court has no authority to substitute its decision for that of the trial court." ' " (*Id.* at p. 319.)

In challenging the juvenile court's order restricting her to virtual visitation, mother appears to raise two arguments.

7

First, mother contends the juvenile court abused its discretion by limiting her to virtual visitation because in-person visits could have safely taken place at a police station. Mother notes that since she entered residential drug treatment, she expressed remorse for kidnapping Wy. and Willow and promised not to take the children without authorization again. But the record reflects the parents' history of disregarding court orders and attempting to flee with Wy. and Willow to avoid DCFS involvement.

The parents' flight risk became apparent just days after Wry.'s birth, well before the attempted and successful abductions. Mother abruptly left the hospital against medical advice, leaving newborn Wry. behind without alerting any hospital personnel. Two days later, the parents fled the home where they were renting a room at the time, taking Willow and Wy. with them. They then refused to answer DCFS's phone calls.

DCFS did not recover Wy. and Willow until June 20, 2023. On that date, a deputy from the Orange County Sheriff's Department informed DCFS that he had located the children on a road leading into a ranch in San Juan Capistrano. The parents ultimately contacted DCFS after the children were declared dependents of the court in October 2023.

During the reunification period, as noted, the parents attempted on two occasions to abduct Wy. and Willow during monitored visits located at a DCFS office.

The first incident occurred in January 2024. The children's caregivers had parked in the DCFS office's lot and were unloading the children from their car when they saw the parents walking toward them. Father then removed Wy. from caregiver Mr. D.'s arms and placed the child into the parents' vehicle.

Mother tried to do the same with Willow, but caregiver Mr. C. intervened and retrieved the children from the parents' car. The caregivers immediately placed the children back into their car and sought help from a nearby DCFS employee. The parents drove off. Wy. and the DCFS employee corroborated the caregivers' account of the incident.

On August 14, 2024, the parents successfully abducted Wy. and Willow from a visit supervised by two monitors. As the visit was ending, father informed the monitors that he and mother were taking their children. The parents each left the visitation room with a child in hand and exited the building through an emergency exit. One of the monitors notified the security officers and sheriffs stationed in the lobby. The other monitor followed the parents out the door and warned them that "they were not helping their situation." Ignoring the comment, the parents walked to their vehicle and placed the children inside. Two weeks later, after an Amber alert was issued, law enforcement recovered the children in a remote area in Oregon, where they were living with their parents in a tent lacking adequate resources.

Prior to their August 2024 arrest for this incident, the parents flatly refused to participate in reunification services as ordered by the juvenile court. And a few days after their February 2025 conviction, the parents violated the original criminal protective order preventing them from contacting Willow and Wy. by sending them a Valentine's Day card.

Accordingly, the record shows the parents fled with Wy. and Willow at the outset of the case to avoid DCFS, flouted juvenile and criminal court orders, tried to kidnap Wy. and Willow from their caregivers at a DCFS parking lot, and

abducted the children from a visit supervised by two monitors at a DCFS office where sheriffs and security guards were on site. On these facts, the juvenile court could reasonably view mother's expressions of remorse with skepticism and conclude the parents would pose a flight risk even if visits were held at a police station. The court, therefore, did not abuse its discretion when it denied mother's post-incarceration, post-reunification period requests for in-person visits and restricted her to virtual visitation.

Next, mother appears to argue that due primarily to their virtual nature, her visits in 2025 "were so poor quality" that she was effectively denied visitation outright in violation of her right to due process. Mother faults the small size of the screen on which the parents appeared to the children, poor camera placement affecting mother's view of the children, and the monitors' failure to ensure the children were meaningfully engaged during visits.

Between May 9 and August 4, 2025, the parents had more than 15 virtual visits with the children. The visits generally lasted one to two hours. The parents tried to engage the children in various ways, asking them questions, encouraging the children to sing and dance with them, reading books to the children, and showing the children flash cards. Despite the parents' efforts, however, the children preferred to play with one another and the toys or activities available in the room, showing little interest in their parents. Wry. did not respond to the parents or acknowledge their presence. More than once, Wy. stated he did not want to speak with his parents.

The monitors encouraged the children to interact with their parents and attempted to redirect them when they engaged in overly hyperactive or aggressive behavior. They tried to keep the

10

children in the parents' view by repositioning the camera and following the children with the camera as they played around the room. During several visits, the monitors brought Wry. closer to the camera so the parents could see him; Wry., however, would quickly grow restless and walk away. The monitors also encouraged Willow and Wy. to show the parents the toys they were playing with or the drawings they made. The two older children responded to the monitors' prompts inconsistently. Sometimes, they briefly showed the parents their toy or drawing, then resumed playing amongst themselves. Other times, they refused to interact.

The evidence credited by the juvenile court shows the children exhibited no distress or frustration when visits were interrupted or otherwise affected by technical difficulties. Nor did the children appear sad when visits ended. Instead, they joyfully returned to their caregivers without issue.

Despite occasional scheduling and technical challenges, the parents participated in numerous virtual visits, during which they made efforts to engage the children with limited success. The visits suffered in quality due to their virtual setting. The children's disengagement, however, ultimately stemmed from their weakened bond with their parents following seven months without contact for which the parents themselves were responsible. Moreover, the virtual nature of the visits was due to the parents' behavior. And at the end of the day, the juvenile court had to ensure that frequency of visitation was "consistent with the well-being of the child" (§ 362.1, subd. (a)(1)(A)) and that "[n]o visitation order . . . jeopardize the safety of the child" (*Id.*, subd. (a)(1)(B)). We reject mother's contention that she was

11

constructively and improperly denied visitation due to issues largely attributable to the virtual medium.

In sum, the juvenile court did not abuse its discretion by restricting mother to virtual visits.  And its order did not result in the constructive and improper denial of her right to visitation.

**B.**

The juvenile court did not abuse its discretion by denying mother's section 388 petition to reinstate reunification services on the eve of permanency planning.

"Section 388 accords a parent the right to petition the juvenile court for modification of any of its orders based upon changed circumstances or new evidence." (*In re Alayah J.* (2017) 9 Cal.App.5th 469, 478, fn. omitted.)  "The [parent] has the burden of showing by a preponderance of the evidence (1) that there is new evidence or a change of circumstances *and* (2) that the proposed modification would be in the best interests of the child." (*In re Mickel O.* (2011) 197 Cal.App.4th 586, 615.)  "In considering whether the [parent] has made the requisite showing, the juvenile court may consider the entire factual and procedural history of the case." (*Id.* at p. 616.) "We review the juvenile court's denial of a section 388 petition for an abuse of discretion." (*Ibid.*)

Despite mother's contrary contentions, the juvenile court reasonably declined to reinstate reunification services.  We evaluated each of the two section 388 prongs.

**1.**

With respect to the first prong, "the [parent] must show *changed*, not changing, circumstances.  [Citation.]  The change of circumstances or new evidence 'must be of such significant nature

12

that it requires a setting aside or modification of the challenged prior order.' " (*In re Mickel O.*, *supra*, 197 Cal.App.4th at p. 615.)

In arguing she established changed circumstances, mother notes that while incarcerated, she completed a parenting course, a domestic violence course, and a substance abuse treatment course. Upon her release, she then completed a 90-day residential drug treatment program, in which she attended all required classes, actively participated in group discussions, completed all assignments, received counseling, and submitted to drug testing. Mother also asserts she has learned a lot from her classes, gaining insight into the importance of maintaining her sobriety and how her past actions impacted her family.

Mother's recent participation in services and her progress are commendable. Having reviewed the record, however, we conclude the juvenile court did not exceed the bounds of reason by finding she established changing, rather than changed, circumstances.

Mother has a long history of abusing illicit substances with father. Maternal grandmother reported mother's drug abuse during adulthood strained mother's familial relationships. She personally witnessed the parents under the influence of drugs when they visited her home for a few days. Mother's cousin, Lauren F., similarly reported that the parents used drugs together. When Wry. was born, hospital staff observed mother exhibited physical signs of long-term, ongoing methamphetamine use, including an aged appearance, scabs and marks from picking her skin, and missing teeth.

By the time of the hearing on her section 388 petition, mother had only been out of residential substance treatment for about two months. She had yet to enroll in outpatient services

13

despite expressing in the declaration supporting her petition an intention to do so.

While testifying at the August 2025 hearing, mother denied doing drugs with father and continued to minimize her own drug use. On the latter point, though she admitted to a history of substance abuse, she characterized her use shortly before Wry.'s birth in 2023 as a one-time lapse in judgment amidst a period of sobriety dating back to 2019. Contrary to her testimony, however, Wy. and mother tested positive for amphetamines and THC upon Wy.'s birth in 2020. Further, in June 2023, DCFS reported mother may have been under the influence of drugs during a 14-minute tirade over the phone, during which mother spoke rapidly, irrationally, and erratically. Two months later, police searched the car in which the parents appeared to be living and recovered a baggie containing a white, crystal-like substance resembling methamphetamine, along with a hypodermic syringe. And the caregivers reported the parents may have been under the influence of drugs during the January 2024 kidnapping attempt, when they exhibited "very threatening" behavior, telling the caregivers "they had put a nanny cam in [the caregivers'] home" and accusing the caregivers of child abuse.

Accordingly, the juvenile court reasonably found that, although mother completed several programs, including residential drug treatment, she had yet to demonstrate sufficient resolution of her substance abuse issues. For this reason, mother's reliance on *In re J.M.* (2020) 50 Cal.App.5th 833, is misplaced. There, the Court of Appeal held the mother had established changed circumstances to allow reinstatement of reunification services, as she "had resolved the domestic violence underlying the initial dependency petition: She had not been in

14

contact with [the] [f]ather for over a year, had completed all required domestic violence training, and nothing suggested [the] [m]other was or had been in another potentially violent or abusive relationship." (*Id.* at p. 846.) The same is not true here. Instead, on the record before us, the juvenile court did not abuse its discretion by finding mother had not established sufficiently changed circumstances.

**2.**

As to the best interests of the children, the second section 388 prong, the court may consider factors such as "the seriousness of the reason for the dependency and the reason the problem was not overcome; the relative strength of the parent-child and child-caretaker bonds and the length of time the child has been in the system; and the nature of the change in circumstances, the ease by which the change could be achieved, and the reason the change was not made sooner." (*In re Aaliyah R.* (2006) 136 Cal.App.4th 437, 446–447.) And where, as here, "reunification services have been terminated, the parents' interest in the care, custody and companionship of the child are no longer of overriding concern. [Citation.] The focus then shifts to the child's need for permanency and stability, and there is a rebuttable presumption that continued foster care is in the child's best interests." (*Id.* at p. 448.)

Mother asserts reinstatement of her reunification services would serve the children's best interests because the children are closely bonded to her and "deserved to learn about their heritage" from her. Applying the factors above, we conclude the juvenile court did not abuse its discretion by finding the requested order was not in the children's best interests.

15

First, as discussed already, mother had not resolved the extensive and significant substance abuse issues giving rise to this case.

Second, Wry. had lived with the caregivers since he was discharged from the hospital as an infant. By the time of the hearing on mother's section 388 petition, Wy. and Willow were five and three years old, respectively, and had been with the caregivers for over two years. Thus, Willow had lived with the caregivers for a majority of her life, and Wy. had spent a significant portion of his life in their home.

Third, the record reflects the children shared a strong bond with their caregivers, Mr. D. and Mr. C. The children were relaxed in their presence and sought their attention and comfort when in need or in distress. They also followed the caregivers' instructions and responded appropriately when the caregivers disciplined or redirected them.

Willow had referred to Mr. D. as "Daddy" and Wy. sometimes called Mr. C. "Dad." While Wy. recognized mother and father, he viewed the caregivers as his parents. For example, during a virtual visit held in July 2025, Wy. refused to show mother and father, when prompted the monitor, a picture he had drawn. Instead, he brought the picture to his caregivers, whom he referred to as " '[m]y parents.' " In a subsequent visit, mother asked Wy. to draw his parents. He responded by drawing a picture of himself, his siblings, his caregivers, and one of the caregiver's mothers. More than once, Wy. has — without being prompted to do so — told DCFS that he loves his caregivers. And Wy.'s therapist opined he "ha[d] a great bond with [his] foster parents in wanting to share everything he does in session[s] and processing confusing feelings" with them.

Mother correctly observes that before the parents' abduction of Willow and Wy. in August 2024, they shared a strong bond with their older children and were developing a bond with Wry. After that incident, and the ensuing seven months of no contact due to the criminal court's protective order, however, the bond weakened substantially. As discussed previously, the evidence of the virtual visits between May and early August 2025 reflects Willow and Wy. had little interest in interacting with their parents, sometimes refusing to engage with them even when prompted by the monitors. Wry. did not recognize or respond to his parents at all. The children exhibited no distress or sadness when visits ended or were interrupted by technical difficulties.

Beyond asserting the strength of her bond with the children, mother contends she rebutted the presumption that continued placement with the caregivers is in the children's best interests by showing Mr. C. had previously been convicted of threatening with intent to terrorize under Penal Code section 422; Willow shares a bedroom with her brothers in the caregivers' home in violation of California Code of Regulations, title 22, section 89387; and the caregivers have anger issues.

But these alleged deficiencies with the caregivers do not alter our conclusions regarding mother's section 388 petition. Mother's petition did not seek the children's placement in her care or elsewhere based on her asserted concerns with the caregivers. She only requested reinstatement of reunification services. The issue, then, is whether an order granting the specific relief sought is in the children's best interests. (See *In re Edward H.* (1996) 43 Cal.App.4th 584, 594.) In addressing this question, mother must rebut the presumption that the children's

17

continued placement with their caregivers, who are also their prospective adoptive parents, is in their best interests because it advances their paramount need for permanency and stability. (See *In re Angel B.* (2002) 97 Cal.App.4th 454, 464–465.) Mother's conclusory argument based on her qualms with the caregivers fails to elucidate how an order granting her six additional months of reunification services would promote stability for the children or advance a need more important than their need for permanency. (See *In re Edward H.*, at p. 594 [mother's section 388 petition seeking reinstatement of reunification services "would not have promoted stability for the children and thus would not have promoted their best interests"].) At bottom, whether or not mother's petition was granted, the caregivers were going to keep control of the children pending further orders of the court.

In sum, the juvenile court did not exceed the bounds of reason by finding reinstatement of mother's reunification services, especially in light of the insufficiently changed circumstances, was not in the children's best interests.

### III.

The juvenile court's adoptability finding was proper.

### A.

To start, DCFS's adoptability assessment report was adequate.

Ahead of a section 366.26 permanency planning hearing, DCFS prepares an assessment containing the information set forth in section 366.21, subdivision (i). Among other things, the report must evaluate "the child's medical, developmental, scholastic, mental, and emotional status." (§ 366.21, subd. (i)(1)(C)(i).) The report must also assess "the eligibility and

commitment of any identified prospective adoptive parent . . . , particularly the caretaker," by discussing their "social history including screening for criminal records and prior referrals for child abuse or neglect, the[ir] capability to meet the child's needs, and the[ir] understanding of the legal and financial rights and responsibilities of adoption . . . ." (*Id.*, subd. (i)(1)(D).)

In challenging the juvenile court's adoptability finding, the parents first argue that DCFS's permanency planning assessment failed to comply with section 366.21, subdivision (i). Specifically, they assert the report is "missing current information about the children's medical, developmental, mental and emotional status," and omitted from its analysis of the caregivers' criminal histories Mr. C.'s Penal Code section 422 conviction. The "most concerning omission," they contend, was of details relating to Wry.'s heart murmur. Although not entirely clear, the parents appear to assert the shortcomings in DCFS's report undermine the adoptability finding by calling into question the validity of the information on which it was based.

We reject the parents' argument for three reasons. First, they forfeited their challenges to the report by failing to bring the deficiencies asserted on appeal to the juvenile court's attention. (See *In re A.A.* (2008) 167 Cal.App.4th 1292, 1317 [parents forfeited objections to the permanency planning assessment report because "no one challenged the adequacy of the agency's assessment on any grounds, let alone on the grounds" raised on appeal]; see also *In re Urayna L.* (1999) 75 Cal.App.4th 883, 886 [mother forfeited objection to permanency planning assessment's adequacy by failing in the juvenile court to "assert her right to have [the omitted] information included in the report"].)

19

Second, even if imperfect, DCFS's adoptability assessment substantially complied with section 366.21, subdivision (i). (See *In re John F.* (1994) 27 Cal.App.4th 1365, 1378 ["Substantial compliance with the assessment provisions has been deemed enough"].) Here, the report discusses in detail the caregivers' social histories, along with the results of DCFS's investigation into their criminal history, their motivation for seeking adoption, and their relationship with the children. The report also addresses their ability to meet the children's needs. In so doing, the report discusses, in detail and to the extent applicable, each child's medical, developmental, academic and speech-related issues.

Third, an adoptability finding need not be reversed based on an incomplete permanency planning assessment. Where, as here, "the assessment is incomplete in some respects, the [juvenile] court will look to the totality of the evidence; deficiencies will go to the weight of the evidence and may ultimately prove insignificant." (*In re John F.*, *supra*, 27 Cal.App.4th at p. 1378.)

**B.**

The report's adequacy aside, substantial evidence supports adoptability.

"The court may terminate parental rights only if it determines by clear and convincing evidence the minor is likely to be adopted. (§ 366.26, subd. (c)(1).) The statute requires clear and convincing evidence of the likelihood adoption will be realized within a reasonable time." (*In re R.C.* (2008) 169 Cal.App.4th 486, 491.) "The 'likely to be adopted' standard is a low threshold." (*In re J.W.* (2018) 26 Cal.App.5th 263, 267.)

20

The juvenile court may find "it is likely the child will be adopted" within the meaning of section 366.26, subdivision (c)(1), by determining the child is "generally adoptable" or "specifically adoptable."  (See Seiser & Kumli, Cal. Juvenile Courts Practice and Procedure (2026) § 2.171; see also *In re B.D.* (2019) 35 Cal.App.5th 803, 817.)  At the section 366.26 hearing, however, the juvenile court is not required to specify whether the child is generally or specifically adoptable.  (*In re Mary C.* (2020) 48 Cal.App.5th 793, 802.)  Instead, the court need only "find by clear and convincing evidence that the [child is] 'likely' to be adopted within a reasonable time."  (*Ibid.*)

"A child is 'generally adoptable' when his or her personal characteristics such as age, appearance, and behavior are sufficiently appealing to make it likely that an adoptive family will be located in a reasonable time, regardless of whether a prospective adoptive family has been found."  (Seiser & Kumli, Cal. Juvenile Courts Practice and Procedure, *supra*, § 2.171.)  Thus, general adoptability "focuses on the *minor*, e.g., whether the minor's age, physical condition, and emotional state make it difficult to find a person willing to adopt the minor.  [Citations.]  Hence, it is not necessary that the minor already be in a potential adoptive home or that there be a proposed adoptive parent 'waiting in the wings.' " (*In re Sarah M.* (1994) 22 Cal.App.4th 1642, 1649.)  Still, "the existence of a prospective adoptive parent, who has expressed interest in adopting a dependent child, constitutes evidence that the child's age, physical condition, mental state, and other relevant factors are not likely to dissuade individuals from adopting the child.  In other words, a prospective adoptive parent's willingness to adopt generally indicates the child is likely to be adopted within a reasonable

21

time either by the prospective adoptive parent or by some other family." (*In re A.A.*, *supra*, 167 Cal.App.4th at p. 1312.) "If the child is considered generally adoptable, we do not [at the time] examine the suitability of the prospective adoptive home." (*In re Carl R.* (2005) 128 Cal.App.4th 1051, 1061.)

"[I]n some cases[,] a minor who ordinarily might be considered unadoptable due to age, poor physical health, physical disability, or emotional instability is nonetheless likely to be adopted because a prospective adoptive family has been identified as willing to adopt the child." (*In re Sarah M.*, *supra*, 22 Cal.App.4th at p. 1650.) "Where the social worker or adoption worker opines the child is likely to be adopted based solely on the existence of a prospective adoptive parent who is willing to adopt the child, the child is said to be 'specifically adoptable.' " (Seiser & Kumli, Cal. Juvenile Courts Practice and Procedure, *supra*, § 2.171.) In cases involving specific adoptability, "the analysis shifts from evaluating the characteristics of the child to whether there is any legal impediment to the prospective adoptive parent's adoption and whether he or she is able to meet the needs of the child." (*In re Helen W.* (2007) 150 Cal.App.4th 71, 80.)

We review the juvenile court's adoptability finding for substantial evidence. (*In re Josue G.* (2003) 106 Cal.App.4th 725, 732.) Where, as here, we must review "a finding that a fact has been proved by clear and convincing evidence, the question . . . is whether the record as a whole contains substantial evidence from which a reasonable fact finder could have found it highly probable that the fact was true. In conducting [our] review, [we] must view the record in the light most favorable to the prevailing party below and give appropriate deference to how the trier of fact may have evaluated the credibility of witnesses, resolved

22

conflicts in the evidence, and drawn reasonable inferences from the evidence." (*Conservatorship of O.B.* (2020) 9 Cal.5th 989, 1011–1012 (*O.B.*).)

According to the parents, substantial evidence does not support the juvenile court's adoptability finding. They contend the children are not generally adoptable because the children "display rather serious challenges that did not improve substantially over the course of the case." In addition, the parents argue the children are not specifically adoptable, as the caregivers face several legal impediments to adoption.

We reject the parents' contentions. Substantial evidence supports the juvenile court's implied finding that the children are generally adoptable. We, therefore, need not address whether the children are specifically adoptable.

By the time of the section 366.26 hearing held in August 2025, Wy. was five years old, Willow was three years old, and Wry. was two years old. Their young age is an "attribute[ ] indicating [their] adoptability." (See *In re Gregory A.* (2005) 126 Cal.App.4th 1554, 1562.)

As for their physical health, the record shows that although Wy. was born drug exposed, neither he nor Willow has any medical conditions requiring continuing care or treatment. Like Wy., Wry. was also born drug exposed. He additionally has eczema and a heart murmur. However, per Wry.'s cardiologist, the murmur is not life threatening and will only require monitoring.

With respect to their developmental statuses, all three children have speech delays but otherwise are meeting age-appropriate milestones. Willow and Wy. both have Individualized Education Programs, with the former qualifying

23

for speech therapy and the latter currently receiving services. Willow has progressed in her speech, and although behind initially, Wy.'s academics are improving. Wry. is trying to talk; he knows a handful of single words and he imitates. Although he originally did not qualify for services, Wry. has been re-referred to the Regional Center for an assessment because, similar to his siblings, "he appears to be behind in speech . . . ."

Behaviorally, the children are high-energy and active, often exhibiting hyperactivity during virtual visits with their parents. Their hyperactivity, however, appears limited to the visitation context. When visits ended, the children calmed down drastically. The parents do not cite, and we could not locate, any evidence showing the children displayed hyperactive behavior in other contexts.

Despite having a few special needs, the children exhibit several positive qualities illustrative of their adoptability. They are friendly, affectionate, and joyful. For example, the children regularly greeted the DCFS social worker and the visit monitors warmly with a hug, even when meeting them for the first time. The children can form loving interpersonal relationships, having done so with their caregivers and with one another. Although they bicker on occasion, the children enjoy playing together and express concern for one another. The caregivers' willingness to adopt the children notwithstanding their special needs further illustrates their general adoptability.

In sum, while the children have a few special needs requiring support, those needs did not remove them from the realm of general adoptability. (See *In re Mary C.*, *supra*, 48 Cal.App.5th at pp. 804–805 [affirming finding that two siblings with significant developmental delays and behavioral

24

issues were generally adoptable because the children had several "positive qualities," including the ability to "form loving, trusting relationships"]; see also *In re R.C., supra,* 169 Cal.App.4th at p. 492 [11-month-old's "positive characteristics ma[d]e him [generally] adoptable despite his in utero exposure to heroin, [and] slight speech delays"].)  The record here "contains substantial evidence from which [the juvenile court] could have found it highly probable that" the children will likely be adopted in a reasonable time by their caregivers or by another family. (*O.B.*, *supra*, 9 Cal.5th at p. 1011; *In re R.C.*, at p. 491.)

Having concluded substantial evidence demonstrates the children are generally adoptable, we need not address whether they are specifically adoptable.  For this reason, we do not consider the parents' contentions regarding the adoptive home's suitability or the caregivers' legal impediments to adoption.  (See *In re Carl R., supra,* 128 Cal.App.4th at p. 1061 [where the record demonstrates a child is generally adoptable, "the suitability of the prospective adoptive family does not constitute a legal impediment to adoption and is irrelevant to the issue of whether a child is likely to be adopted"].)

Mother argues that even if the children are generally adoptable, the court should have declined to terminate parental rights and continued the matter for 180 days pursuant to section 366.26, subdivision (c)(3), because the children "would be considered 'difficult to place for adoption.' "  We reject this argument as forfeited because mother did not request such a continuance in the juvenile court.  (See *In re Dakota H.* (2005) 132 Cal.App.4th 212, 221 ["A party forfeits the right to claim error as grounds for reversal on appeal when he or she fails to raise the objection in the trial court"].)

25

**IV.**

Though we have concluded the juvenile court orders regarding visitation, changed circumstances, and adoptability were proper, DCFS did not discharge its duty of inquiry as required under ICWA and related California law. (See *In re Abbigail A.* (2016) 1 Cal.5th 83, 91 [the Legislature incorporated ICWA's requirements into California law in 2006].)

"ICWA reflects a congressional determination to protect Indian children and to promote the stability and security of Indian tribes and families by establishing minimum federal standards a state court must follow before removing an Indian child from his or her family." (*In re T.G.* (2020) 58 Cal.App.5th 275, 287.) In general, both ICWA and the Welfare and Institutions Code define an " 'Indian child' " as "any unmarried person who is under age eighteen and is either (a) a member of an Indian tribe or (b) is eligible for membership in an Indian tribe and is the biological child of a member of an Indian tribe." (25 U.S.C. § 1903(4); § 224.1, subd. (b)(1).)

The juvenile court and DCFS have "an affirmative and continuing duty to inquire whether a child for whom a petition under Section 300 . . . may be or has been filed, is or may be an Indian child." (§ 224.2, subd. (a).) This continuing duty can be divided into three phases: the initial duty to inquire, the duty of further inquiry, and the duty to provide formal ICWA notice. (See *In re J.C.* (2022) 77 Cal.App.5th 70, 77–78.) The phase at issue here is the duty of further inquiry.

Further inquiry arises only when DCFS "has reason to believe that an Indian child is involved in a proceeding, but does not have sufficient information to determine that there is reason to know that the child is an Indian child . . . ." (§ 224.2, subd. (e).)

26

A "reason to believe" exists when DCFS "has information suggesting that either the parent of the child or the child is a member or citizen, or may be eligible for membership or citizenship, in an Indian tribe. Information suggesting membership or eligibility for membership includes, but is not limited to, information that indicates, but does not establish, the existence of one or more of the grounds for reason to know enumerated in" section 224.2, subdivision (d). (§ 224.2, subd. (e)(1).) As relevant here, DCFS has "reason to know" an Indian child is involved in a proceeding when, among other things, "[a] person having an interest in the child, including . . . a member of the child's extended family informs the court that the child is an Indian." (*Id.*, subd. (d)(1).)

"The required further inquiry includes (1) interviewing the parents and extended family members; (2) contacting the Bureau of Indian Affairs (BIA) and State Department of Social Services; and (3) contacting tribes the child may be affiliated with and anyone else that might have information regarding the child's membership or eligibility in a tribe." (*In re Dezi C.* (2024) 16 Cal.5th 1112, 1132–1133, citing § 224.2, subd. (e)(2)(A)–(C).) For purposes of further inquiry, "contact with a tribe 'shall, at a minimum, include telephone, facsimile, or electronic mail contact to each tribe's designated agent for receipt of [ICWA] notices,' and 'sharing information identified by the tribe as necessary for the tribe to make a membership or eligibility determination, as well as information on the current status of the child and the case.'" (*In re Dezi C.*, at p. 1133, citing § 224.2, subd. (e)(2)(C).)

" 'Where, as here, the juvenile court finds ICWA does not apply to a child, "[t]he finding implies that . . . social workers and the court did not know or have a reason to know the children

27

were Indian children and that social workers had fulfilled their duty of inquiry."  [Citations.]'  ' "[W]e review the juvenile court's ICWA findings under the substantial evidence test . . . ." ' " (*In re Josiah T.* (2021) 71 Cal.App.5th 388, 401; see *In re Dezi C.*, *supra*, 16 Cal.5th at p. 1134.)

The parties dispute whether DCFS's initial inquiry yielded sufficient information to trigger its duty of further inquiry. According to the parents, DCFS had reason to believe the children are Indian children through both sides of their family. Regarding their paternal lineage, father observes his adoptive sister informed DCFS that his deceased adoptive grandfather had Cherokee heritage but was not registered with a tribe.  As for their maternal lineage, mother notes she told DCFS that her family is "related to the Blackfoot tribe based out of Florida."  She stated "she was [the] third generation removed from the tribe, and they were not registered or connected to the tribe."

We agree with the parents that this information required further inquiry.  Where, as here, a parent reports possible Indian ancestry through a specific or identifiable tribe, DCFS has reason to believe the children are Indian children and, thus, must conduct a further inquiry.  (See *In re D.F.* (2020) 55 Cal.App.5th 558, 569 [further inquiry required where mother reported she may have Indian ancestry through an unnamed tribe in New Mexico]; *In re T.G.*, *supra*, 58 Cal.App.5th 275, 292 [further inquiry required where mother reported potential Cherokee ancestry through her maternal family and possible Indian ancestry with an unknown tribe through her paternal grandfather]; cf. *In re J.D.* (2010) 189 Cal.App.4th 118, 125 [grandmother's report that she was told by her grandmother that she had Indian ancestry through an unknown tribe "[was] too

28

vague, attenuated, and speculative to give the dependency court any reason to believe the child might be an Indian child"].)

DCFS raises two discernible counterarguments. First, it seems to argue adoptive great-grandfather's Cherokee heritage did not give it a reason to believe the children are Indian children because he was not registered with a tribe, and was not related to the children by blood. It is well-settled, however, that under ICWA, tribal membership is treated "as a matter of political affiliation rather than racial origin" and "the question of membership is determined by the tribes, not the courts or child protective agencies." (*In re B.R.* (2009) 176 Cal.App.4th 773, 783; *In re T.G.*, *supra*, 58 Cal.App.5th at p. 294.) We, therefore, decline to assume — as DCFS suggests we should — the children are ineligible for Cherokee membership because their connection to the tribe lies with an adoptive relative who reportedly was not registered with a tribe. (See *In re B.R.*, at pp. 777, 784–785 [recognizing "father is potentially a member of an Apache tribe" because his adoptive father is one-quarter Apache].)

Next, DCFS contends the information reported by mother was insufficient to trigger further inquiry because "there is no Blackfoot tribe from Florida," and the only federally recognized Blackfeet tribe is the Blackfeet of the Blackfeet Indian Reservation of Montana. We disagree.

DCFS's inquiry duty is " 'premised on the commonsense understanding that, over time, Indian families, particularly those living in major urban centers like Los Angeles, may well have lost the ability to convey accurate information regarding their tribal status.' " (*In re E.C.* (2022) 85 Cal.App.5th 123, 147.) In discharging its duty, then, DCFS could not discount the possibility that mother slightly misidentified the tribe to which

29

her family is related. (Cf. *In re D.F.*, *supra*, 55 Cal.App.5th at p. 569 [further inquiry required where mother identified the location, but not the name, of a tribe].) Nor could DCFS rule out the possible inaccuracy of mother's and her other relatives' prior denials of Indian ancestry. (See *In re T.G.*, *supra*, 58 Cal.App.5th at p. 289 ["Oral transmission of relevant information from generation to generation and the vagaries of translating from Indian languages to English combine to create the very real possibility that a parent's or other relative's identification of the family's tribal affiliation is not accurate"]; see also *In re Josiah T.*, *supra*, 71 Cal.App.5th at p. 405 ["[A] mere change in [ICWA] reporting, without more, is not an automatic ICWA free pass; when there is a conflict in the evidence and no supporting information, DCFS may not rely on the denial alone without making some effort to clarify the [reporting] relative's claim"].)

In sum, for the reasons stated above, we conclude DCFS had reason to believe the children are Indian children and, therefore, should have conducted a further inquiry pursuant to section 224.2, subdivision (e). The record does not contain any evidence, let alone substantial evidence, demonstrating it took the statutorily-required actions. (See § 224.2, subd. (e).) DCFS does not dispute its non-compliance with section 224.2, subdivision (e)(2). We, therefore, must conditionally reverse the order terminating parental rights and remand the matter to the juvenile court for compliance with ICWA's inquiry requirements. (See *In re Dezi C.*, *supra*, 16 Cal.5th at p. 1125.)

30

**DISPOSITION**

We conditionally reverse the order terminating parental rights and remand the matter to the juvenile court for compliance with ICWA's inquiry requirements consistent with this opinion. If the juvenile court thereafter finds a proper and adequate further inquiry has been conducted and concludes ICWA does not apply (§ 224.2, subd. (i)(2)), then the court shall reinstate the order terminating parental rights. If the juvenile court concludes ICWA applies, it shall proceed in conformity with ICWA and California implementing provisions. (See 25 U.S.C., § 1912, subd. (a); §§ 224.2, subd. (i)(1), 224.3, 224.4.)


SCHERB, J.

We concur:



STRATTON, P. J.



WILEY, J.

31